**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BIG LOTS STORES, INC.,** | : | |
| | : | **Case No. 2:14-cv-02635** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Jolson** |
| **AMERICAN GUARANTEE & LIABILITY** | : | |
| **INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (Doc. 69)

of Defendant American Guarantee & Liability Insurance Company ("American Guarantee") and

the Motion for Partial Summary Judgment (Doc. 70) of Plaintiff Big Lots Stores, Inc. ("Big

Lots"). For the following reasons, the Court **GRANTS in part** and **DENIES in part** American

Guarantee's Motion and **GRANTS in part** and **DENIES in part** Big Lots' Motion.

### I.     BACKGROUND

#### A.  Factual Background.

##### 1.   *The Insurance Policies.*

Non-party Arch Insurance Company ("Arch") provides Big Lots with primary-layer

commercial general liability insurance, which includes coverage for product liability claims.

(Second Am. Compl., Doc. 61, ¶ 2.) The Arch insurance policy (the "Arch Policy") has limits of

$1,000,000 per occurrence and $4,000,000 in the aggregate for product-completed operations.

(*Id.* ¶ 14, Ex. 2.) The Arch Policy also has a self-insured retention ("SIR")[1] of $1,000,000. (*Id.*)

---

[1] A self-insured retention is a feature of an insurance policy similar to a deductible, defined by Black's Law Dictionary as: "[t]he amount of an otherwise-covered loss that is not covered by an insurance policy and that usu. must be paid before the insurer will pay benefits." *SIR*, *Black's Law Dictionary* (10th ed. 2014).

American Guarantee provides commercial liability umbrella insurance to Big Lots (the "American Guarantee Policy"). (*Id.* ¶ 15.) The American Guarantee Policy affords Big Lots, among other things, "Excess Follow Form Liability Insurance." (*Id.*, Ex. 3.) As a follow-form excess insurance policy, the American Guarantee Policy "incorporates the terms and conditions of the underlying insurance," and defines "underlying insurance" to include the Arch Policy. (*Id.*) The American Guarantee Policy has a $25,000,000 per occurrence limit and a $25,000,000 aggregate limit. (*Id.*) Additionally, the American Guarantee Policy has a Maintenance SIR provision. (*Id.* ¶ 16, Ex. 3, Endorsement No. 14.) The Maintenance SIR is implicated if the Arch Policy's aggregate limit is reduced or exhausted. (*See id.*, Ex. 3.) According to Big Lots, this has not occurred. (*Id.* ¶ 17; *see also* Big Lots' Mem. Opp'n Am. Guar.'s Mot. Summ. J., Doc. 75, at 17.)

As stated above, the American Guarantee Policy incorporates the Arch Policy's terms and conditions. (*See* Doc. 61 ¶ 15.) The American Guarantee Policy defines the term "occurrence" as "a covered event as defined in the **underlying insurance**." (*Id.* ¶ 51, Ex. 3, Section V(B)(4) (emphasis in original).) Pursuant to the underlying Arch Policy, an "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* ¶ 52, Ex. 2, Section V(13).)

2. *The Underlying Lawsuits.*

This insurance coverage dispute arises from a series of lawsuits filed against Big Lots by plaintiffs in Illinois, New Jersey, Pennsylvania and Texas,[2] alleging that they suffered personal injuries caused by "large tabletop torches allegedly designed, tested, marketed and sold

---

[2] *Mejia v. Big Lots Stores, Inc.*, Case No. 5:13-cv-00504-HLH, United States District Court for Western District of Texas; *Shrum v. Big Lots Stores, Inc., et al.*, Case No. 14-3135, United States District Court for the Central District of Illinois; *Lacovara v. Big Lots Stores, Inc.*, Case No. 1:14-cv-01953-AMD, United States District Court for the District of New Jersey; and *Frick, et al. v. Big Lots Stores, Inc.*, Case No. 2:15-cv-00360-DSC; United States

in combination with allegedly improper fuel by Big Lots to consumers" (the "Torch Cases"). (*Id.* ¶¶ 3, 18.)

The Torch Case plaintiffs' allegations about the role Big Lots played in their injuries differ.  While several of the complaints contain allegations that Big Lots was involved in the design and manufacture of the torches (*see* N.J. Compl., Doc. 70-7, ¶¶ 1, 17–18, 25–27; Penn. Compl., Doc. 70-8, ¶¶ 7, 12), the other Torch Case plaintiffs allege that Big Lots only purchased for resale, marketed, distributed and sold the torches.  (*See* Tex. Compl., Doc. 70-5, ¶ 3.5; Ill. Compl., Doc. 70-6, ¶¶ 24, 29.)  With the exception of the New Jersey plaintiffs, the Torch Case plaintiffs allege that other parties were also responsible for the torches' malfunctioning. Specifically, the Torch Case plaintiffs allege that Designco designed and manufactured the torches (*see* Doc. 70-5 ¶ 3.5; Doc. 70-6 ¶¶ 15–16; Doc. 70-8 ¶ 7), that Bureau Veritas and the affiliated BV India tested the torches for safety and compliance (*see* Doc. 70-5 ¶ 3.5; Doc. 70-6 ¶¶ 15–16), and that HOC produced the torch fuel that was incompatible for use with the torches sold by Big Lots.  (Doc. 70-8 ¶ 10.)  One of the underlying complaints alleges that the actions of Designco, HOC, Bureau Veritas and BV India—in addition to Big Lots' purported conduct—were proximate causes of the plaintiff's injury.  (*See* Doc. 70-6 ¶¶ 40, 44, 47, 57, 61, 65, 75.)

Two of the Torch Cases (the Texas and Illinois actions) have settled, but the New Jersey and Pennsylvania actions remain pending.  (*See* Doc. 61 ¶¶ 24, 32, 40, 50.)  Before the Texas lawsuit settled, the United States District Court for the Western District of Texas issued an order granting Big Lots partial summary judgment on the plaintiff's product liability claims, holding that Big Lots was a "*non-manufacturing* seller" of the torches.  (*See* Ex. 1 to Am. Guar.'s Mem.

District Court for the Western District of Pennsylvania.  (Exs. B-1 through B-4 to Big Lots' Mot. Part. Summ. J. (Docs. 70-5–70-8).)

Opp'n Big Lots' Mot. Part. Summ. J., Doc. 76-1, at 1, 4 (emphasis added).)  The Texas federal court also opined that the plaintiff had not provided sufficient evidence to show that Big Lots was in any way involved with the design of the torches.  (*Id.* at 5.)

Currently, Big Lots and American Guarantee disagree about their "respective obligations for payment of the settlement and costs of defense" in the settlement of the Texas action, and American Guarantee has refused to participate in the settlement of the Illinois action.  (*See id.*)

### B.  Procedural Background

On December 15, 2014, Big Lots filed a complaint for declaratory judgment against Zurich American Insurance Company ("Zurich").  (Doc. 1.)  Big Lots amended its complaint in April 2015, adding American Guarantee, a wholly-owned subsidiary of Zurich, as a party.  (Doc. 22.)  Because American Guarantee ultimately asserted that "it alone was responsible for the claim(s) processing, investigation, payment and/or other business decisions" related to the insurance coverage dispute at issue, in March 2016, the parties stipulated to the dismissal without prejudice of Zurich as a party.  (Doc. 59 at 2.)

One month later, in April 2016, Big Lots filed its second amended complaint, bringing claims for declaratory judgment, breach of contract and bad faith against American Guarantee. (Doc. 61.)  On June 13, 2016, both parties filed motions for summary judgment.  (Docs. 69, 70.) American Guarantee moves for summary judgment on all of Big Lots' claims against it, while Big Lots moves for partial summary judgment on its declaratory judgment and breach of contract claims.[3]  Both motions are fully briefed and ripe for review by this Court.

---

[3] According to Big Lots, "[r]esolution of Big Lots' Third Cause of Action for Bad Faith has been reserved by agreement of the Parties."  (Doc. 70 at 1.)

## II.    LAW AND ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment.  *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).  Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52).  In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party.  *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).  The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party.  *See Anderson*, 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991). The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

Where, as here, the facts of the case are not in dispute, an insurance coverage action involves solely legal issues and therefore is ripe for adjudication on summary judgment. *See Nat'l Credit Union, Admin. Bd. v. Cumis Ins. Soc'y*, No. 1:11 CV 1739, 2015 WL 2250502, at *6 (N.D. Ohio May 13, 2015).

**B. There Have Been Multiple Occurrences Under the American Guarantee Policy.**

As the insured, Big Lots bears the burden of demonstrating that it is covered by the American Guarantee Policy. *Inland Rivers Serv. Corp. v. Hartford Fire Ins. Co.*, 418 N.E.2d 1381, 1383 (Ohio 1981) ("It is undisputed that one seeking to recover on an insurance policy generally has the burden of proving a loss and demonstrating coverage under the policy."). Because the American Guarantee Policy is an excess insurance policy, Big Lots must prove that the limits of the underlying Arch Policy are exhausted and its SIRs satisfied. If the Torch Cases present a single occurrence, then Arch's obligations will terminate upon the exhaustion of its $1,000,000 "per occurrence" coverage, thereby triggering American Guarantee's excess coverage obligation. But if they constitute separate occurrences, then American Guarantee's

excess coverage obligation will not be triggered until Arch insures Big Lots up to its $4,000,000 aggregate limit.  (*See* Doc. 61 ¶ 14.)

The central issue in this case is therefore whether there has been one occurrence or multiple occurrences under the American Guarantee Policy.  The number of occurrences under an insurance policy is determined based on the language of the policies at issue, and the facts of a particular case.  *See Westfield Ins. Co. v. Cont. Ins. Co.*, No. 1:13CV02367, 2015 WL 1549277, at *4 (N.D. Ohio Apr. 6, 2015) (internal citation omitted).

With regard to the policy language, under Ohio law, the Court analyzes insurance contracts the same as it would any other contract.  *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.*, 597 N.E.2d 1096, 1102 (Ohio 1992).  The Court's role in contract interpretation "is to give effect to the intent of the parties to the agreement."  *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 979 N.E.2d 269, 271 (Ohio 2012) (citation omitted).  Where a policy term is clearly defined, the Court will give it the plain meaning provided by the contract.  *Columbia Cas. Co. v. City of St. Clairsville*, No. 05-cv-898, 2007 WL 756706, at *13 (S.D. Ohio Mar. 8, 2007).  An ambiguous policy is to be liberally construed in favor of the insured.  *Hartzell Indus., Inc. v. Fed. Ins. Co.*, 168 F. Supp. 2d 789, 793 (S.D. Ohio 2001) (citation omitted).

The term "occurrence" is clearly defined in the Arch Policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" and therefore should be given its plain meaning.  (Doc. 61 Ex. 2, Section V(13).)  Indeed, the Arch Policy defines "occurrence" as it is commonly defined in insurance policies, and courts have not found this definition ambiguous.  *See, e.g.*, *Westfield Ins. Co.*, 2015 WL 1549277, at *4.  While Big Lots argues that the language of the Arch and American Guarantee Policies is "susceptible to more than one interpretation" and thus should be construed "liberally in favor of the insured and

7

strictly against the insurer," (Doc. 70 at 7 (quoting *Faruque v. Provident Life & Acc. Co.*, 508 N.E.2d 949, 952 (Ohio 1987))), tellingly, Big Lots does not explain why the term "occurrence" is ambiguous and simply argues that this Court should defer to its interpretation that the Torch Cases all arise from a single occurrence. (*See* Doc. 70 at 7.) But the Court is not required to do so.[4]

Because the policy language itself is unambiguous, the Court looks to the facts of this particular case and analogous case law. But before doing so, the Court notes that a significant portion of Big Lots' briefing is dedicated to arguing about issues on which the parties actually agree. For example, Big Lots argues that, by asserting that multiple occurrences have taken place, American Guarantee is: (1) attempting to transform the American Guarantee Policy's coverage from a "per occurrence" to "per claim" policy; (2) advocating for a blanket rule that in any case where there is a defective product, each sale of that product is an occurrence; and (3) trying to obfuscate by not citing in its opening brief the test that should be applied to determine the number of occurrences. (*See* Doc. 70 at 7–10; Doc. 75 at 6.) But in reality, the parties *agree* that the American Guarantee Policy is a "per occurrence" policy and that the "cause test" (discussed below) should apply; American Guarantee concedes both of these points. (*See* Doc. 76 at 7–8, 10; Doc. 80 at 2, 7.) Nor is American Guarantee arguing for a blanket rule that each sale constitutes an occurrence in cases involving defective products. (*See* Doc. 80 at 4.) Because these are non-issues, the Court declines to analyze them and proceeds to the main

---

[4] Nor is the Court required to defer to Arch's interpretation of the policy. While Big Lots makes much of the fact that "Arch has taken the position that the claims asserted in the Torch Cases arise from a single occurrence," (Doc. 61 ¶ 55), it cites no case law to support its assertion that an excess carrier's incorporation of the same words used in another insurance policy evince an intent to be bound by the primary insurer's interpretation of the policy. This is likely because at least one court has found the opposite to be true: "An excess carrier's intent to incorporate the same words used in a separate agreement between the primary insurer and the insured does not imply an intent by the excess carrier to accept decisions made by the primary carrier about the extent of its obligations under its own agreement." *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 428 (Mass. 2007).

inquiry: whether, under the "cause test," a single occurrence or multiple occurrences have taken place under the American Guarantee Policy.

Ohio, like the majority of states, applies the "cause test" when determining the number of occurrences under an insurance policy.  *See, e.g.*, *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F. Supp. 2d 827 (N.D. Ohio 2006).  Under the cause test, the court considers "if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages."[5]  *Mich. Chem. Corp. v. Am. Home Assurance Co.*, 728 F.2d 374, 379 n.5 (6th Cir. 1984) (quoting *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982)).  If there is, then there is a single occurrence under an insurance contract.  *Manor Care, Inc. v. First Specialty Ins. Corp.*, No. 3:03CV7186, 2006 WL 2010782, at *4 (N.D. Ohio July 17, 2006).  The "converse is also true: Where there are multiple proximate causes, each is a separate occurrence under an insurance contract."  *Id.*

Courts in various jurisdictions have applied the cause test and reached different conclusions about the number of occurrences that took place under an insurance contract.  In *Maurice Pincoffs Co. v. St. Paul Fire and Marine Insurance Co.*, the Fifth Circuit Court of Appeals reversed the trial court's holding that there had been a single occurrence where a company sold and shipped eight loads of contaminated birdseed to feed and grain dealers.  447 F.2d 204, 205 (5th Cir. 1971).  In determining that *each* of the eight sales of the contaminated birdseed constituted an "occurrence" under the applicable insurance policy, the Fifth Circuit held:

> We think that the 'occurrence' to which the policy must refer is the occurrence of the events or incidents for which Pincoffs is liable. *It was the sale of the contaminated seed for which Pincoffs was liable. Although the cause of the contamination is not clear, it seems apparent that Pincoffs received the seed in a*

---

[5] Proximate cause is defined as a "cause that directly produces an event and without which the event would not have occurred."  *Proximate Cause*, *Black's Law Dictionary* (10th ed. 2014).

> *contaminated condition and did not itself contaminate the seed. However, it was not the act of contamination which subjected Pincoffs to liability.* If Pincoffs had destroyed the seed before sale, for instance, there would be no occurrence at all for which the insured would be liable. *But once a sale was made there would be liability for any resulting damages. It was the sale that created the exposure to 'a condition which resulted in property damage neither expected nor intended from the standpoint of the insured,' under the definition of the policy.* And for each of the eight sales made by Pincoffs, there was a new exposure and another occurrence.

*Id.* at 206 (emphasis added); *see also Mich. Chem.*, 728 F.3d at 383 (holding that shipment of a contaminated substance constituted the "act from which liability arose" and holding that each shipment was a separate occurrence); *Westfield Ins. Co.*, 2015 WL 1549277, at *7 (looking to the immediate cause of injury to determine the number of occurrences and finding multiple occurrences).

American Guarantee argues that *Pincoffs*, *Michigan Chemical*, and *Westfield* govern the single vs. multiple occurrence inquiry in the product liability context. Big Lots contends that these cases are factually distinguishable, because as in cases like *Pincoffs*, the only wrongdoing on the part of the insured was the sale of the defective product. (Doc. 70 at 14.) Here, according to Big Lots, it was the company's alleged "chain of business decisions" that led to the underlying injuries, and thus there are "other actions by [Big Lots] from which liability [can] flow." (*Id.* at 13.) For example, the Torch Case plaintiffs allege that Big Lots was responsible for: (1) the creation and approval of the torches' design specifications; (2) improper testing of the torches; and (3) the improper shelving of the torches with a recommended, yet allegedly incompatible, torch fuel. (*See id.* at 15.) Thus, Big Lots argues, to determine whether there is a single occurrence or multiple occurrences, the Court cannot only consider the "immediate event" giving rise to Big Lots' liability—the sale of the torches—but rather the "chain of business decisions"

10

which Big Lots alleges is the single, proximate, uninterrupted, and continuing cause of the injuries alleged in the Torch Cases.

In support of its argument that Big Lots' "chain of business decisions," or its "unitary and continuous development of an allegedly hazardous product," was the single, proximate, uninterrupted, and continuing cause of the injuries alleged in the Torch Cases (Doc. 81 at 3), Big Lots cites *Chemstar, Inc. v. Liberty Mutual Ins. Co.*, 41 F.3d 429 (9th Cir. 1994). In *Chemstar*, rather than find that there were 28 separate occurrences—one for each claim asserted by a homeowner who used lime plaster that was unsuitable for interior use—the Ninth Circuit affirmed the district court's holding that the single "underlying cause of the plaster pitting was [the insured's] failure to warn end-users that the high-periclase lime was unsuitable for indoor use." *Id.* at 431–32. There was no other cause or intervening business decision that interrupted the insured's failure to warn. *Id.* at 432. Similarly, in *Republic Underwriters Insurance Co. v. Moore*, the Tenth Circuit reversed the district court's determination that there had been two separate occurences under the applicable insurance policies when contaminated food had been prepared and served at two different places, causing physical injury. 493 F. App'x 907, 908 (10th Cir. 2012). Rather, the Tenth Circuit reasoned that there was a *single* occurrence, because all of the plaintiffs' injuries were "proximately caused by the restaurant's ongoing preparation of contaminated food." *Id.* at 912.

Big Lots also relies heavily on *Valley Forge Insurance Co. v. National Union Fire Insurance Co.*, No. N10C-07-135, 2012 WL 1432524 (Del. Sup. Ct. Mar. 16, 2012). In *Valley Forge*, the Delaware Superior Court held that the product liability claims at issue constituted a "single occurrence" under the applicable insurance policy. *Id.* at *1. These product liability claims arose after a number of consumers sustained serious injuries and even suffered death

11

when their chenille robes—which had been "spec'd, imported, inspected and sold" by the insured—caught fire.  *See id.* at *3–5.  The court applied the cause test and determined that the "single cause" of the losses for which the insured sought coverage was the insured's "alleged negligence and/or strict liability in connection with production and distribution of an unreasonably dangerous product."  *Id.* at *7–9.  According to the *Valley Forge* court, the "*robe itself* was the alleged source of each claimant's injuries and the subsequent loss sustained by [the insured]," *id.* at *10 (emphasis added), and thus the single occurrence under the insurance policy was the "continuous production and distribution into the stream-of-commerce" of the robes.  *Id.* Therefore, the insurer "misse[d] the mark" when it argued that the "involvement of multiple defendants, different suppliers, inspectors, modes of transportation and raw materials" operated together to create multiple occurrences.  *Id.*

In short, American Guarantee urges the Court to adopt the reasoning set forth in the *Pincoffs*, *Michigan Chemical*, and *Westfield* line of cases, while Big Lots refers the Court to the *Chemstar*, *Republic Underwriters*, and *Valley Forge* line of authority.  Before the Court can embrace one line of precedent, however, a threshold issue must be resolved: whether Big Lots was involved with the design and manufacture of the torches.  Indeed, the *Pincoffs* court's decision that there had been multiple occurrences was based on the fact that Pincoffs could likely only be held liable for the *sale* of the contaminated birdseed, *see Pincoffs*, 447 F.2d at 206, while the *Valley Forge* court's finding of a single occurrence was at least partially premised on the insured's role as a *manufacturer* of the defective product.  *Valley Forge*, 2012 WL 1432524, at *3–5, *9–10.

As previously explained, while some of the Torch Case plaintiffs alleged that Big Lots was involved in the design and manufacture of the torches (*see* Doc. 70-7 ¶¶ 1, 17–18, 25–27;

12

Doc. 70-8 ¶¶ 7, 12), others claimed that Big Lots only purchased for resale, marketed, distributed and sold the torches.  (*See* Doc. 70-5 ¶ 3.5; Doc. 70-6 ¶¶ 24, 29.)  At oral argument, Big Lots asserted that, because certain Torch Case plaintiffs alleged that Big Lots was more than just a seller of the torches, this case is more akin to *Valley Forge* than *Pincoffs*.  But while Big Lots represented to the Court that all it had to consider at this juncture were allegations, the United States District Court for the Western District of Texas has ruled that Big Lots was a non-manufacturing seller of the torches.  (Doc. 76-1 at 1, 4–5.)  If, as Big Lots contended, all the Court had to consider were the Torch Case plaintiffs' allegations, and if the Court was free to make a determination as to Big Lots' role, whether Big Lots was involved in the manufacture and design of the torches would be a genuine issue of material fact, precluding the Court from determining the number of occurrences under the insurance policy.  But given that the federal district court in the Texas action (the "*Mejia* court") held that Big Lots was a non-manufacturing seller of the torches, that determination is binding on this Court.  *See United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979) ("Collateral estoppel precludes litigation of issues between parties or their privies previously determined by a court of competent jurisdiction.")).

    In light of the *Mejia* court's finding that Big Lots was merely a seller of the torches, this Court finds that the *Pincoffs* line of cases is applicable here.  Like the *Pincoffs* court, this Court concludes that "the 'occurrence' to which the [Arch and American Guarantee Policies] must refer is the occurrence of the events or incidents for which [Big Lots] is liable," *Pincoffs*, at 447 F.2d at 206, and it was the sale of the torches for which Big Lots is liable.  And for each sale of a torch, there was a "new exposure and another occurrence."  *Id.* at 206.  The Court notes that it is focusing on each sale as the "act from which liability arose," *Mich. Chem.*, 728 F.3d at 383, *not*

13

creating a rule in products liability cases that each sale constitutes an "occurrence" under an insurance policy.  Also, contrary to Big Lots' belief, the Court's finding of multiple occurrences does not transform the Arch and American Guarantee Policies from "per occurrence" to "per claim" policies.  (*See* Doc. 76 at 7–8.)

In addition to factually distinguishing the cases upon which it relies, Big Lots also argues that the Court cannot adopt the reasoning of the *Pincoffs*, *Michigan Chemical*, and *Westfield* line of authority because those cases apply the "liability event theory" version of the cause test, looking to the "immediate event or events giving rise to liability to determine the number of occurrences," rather than "proximate cause theory" version of the cause test, which asks whether there is a single proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages in the Torch Cases.  *See Mitsui Sumitomo Ins. Co. of Am. v. Duke Univ. Health Sys., Inc.*, 509 F. App'x 233, 238 (4th Cir. 2013).  According to Big Lots, the courts that apply the "liability event theory" version of the cause test take an overly narrow view of cause and are only "nominally" applying the cause test.  (*See* Doc. 70 at 12.)

However, these two inquiries do not seem mutually exclusive.  Indeed, in its own briefs, Big Lots concedes that both inquiries are part and parcel of the "cause test."  (Doc. 70 at 20 ("Under the cause test, the court asks if there was but one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damages" (internal quotation marks omitted)); *id.* at 23 ("[I]n determining the 'occurrence' under the cause test, courts must look to the acts for which the insured is liable.").)  Additionally, Big Lots cites *Michigan Chemical* as stating what it considers is the proper iteration of the cause test, that is, the proximate cause theory of the test.  (Doc. 75 at 7.)  But Big Lots overlooks the fact that—as American Guarantee points out—"*Pincoffs* is part of the foundation of *Michigan Chemical*."  (Doc. 80 at 7.)  In

14

*Michigan Chemical*, the Sixth Circuit Court of Appeals considered the "act from which liability

arose" when determining whether there was "one interrupted and continuing cause."  *Mich.*

*Chem.*, 728 F.2d at 383.  Ultimately, the Sixth Circuit held that because each shipment of

contaminated livestock feed created additional exposure to liability, there was *not* one

uninterrupted and continuing cause, and therefore there were multiple occurrences under the

relevant insurance policies.  *Id.*

 Even if the Court accepted that the *only* relevant question in determining the number of

occurrences is "if there was but one proximate, uninterrupted, and continuing cause which

resulted in all of the injuries and damages," there was not a single proximate cause here.  As

several of the Torch Case plaintiffs alleged, there were multiple proximate causes of the injuries

they suffered, including: (1) the creation and approval of the torches' design specifications; (2)

the improper testing of the torches; and (3) the improper shelving of the torches with a

recommended, yet allegedly incompatible, torch fuel.  (*See* Doc. 70 at 15; Docs. 70-5–70-8.)

Additionally, one of the Torch Cases alleges that the fuel manufacturer (HOC) supplied Big Lots

with a reformulated fuel that had a new, dangerously low flash point and failed to warn Big Lots

of the change, despite its knowledge that the fuel would be sold with incompatible torches.

(Doc. 80 at 10 (citing Doc. 70-5 ¶ 12.7).)  This wrongdoing by HOC also constitutes an

intervening cause[6] that interrupts Big Lots' so-called "chain of business decisions," meaning that

there is no single, proximate, *uninterrupted* cause that led to all of the injuries and damages in

the Torch Cases.

---

[6] An intervening cause is an "event that comes between the initial event in a sequence and the end result, thereby altering the natural course of events that might have connected a wrongful act to an injury; esp., an independent agency's act that destroys or severely weakens the causal connection between the defendant's negligent act and the wrongful injury. . . ."  *Intervening Cause*, *Black's Law Dictionary* (10th ed. 2014).

Finally, as American Guarantee argues, Big Lots' assertion that a "*chain* of business decisions" is the *single*, proximate, uninterrupted, and continuing cause of the Torch Case plaintiffs' injuries is fundamentally inconsistent.  The "chain of business decisions" is an "aggregation of causes" (Doc. 80 at 9) rather than a single cause.  Further, Big Lots cites no case law where a court found a "chain of business decisions" to constitute a single occurrence.  (*Id.*)  Asked during oral argument which cases support its "chain of business decisions" as a "single occurrence" theory, Big Lots referenced: (1) *CHS Community Health Systems, Inc. v. Lexington Insurance Co.*, No. 3:11-cv-00449, 2013 WL 650047 (M.D. Tenn. Dec. 9, 2013); (2) *Appalachian Insurance Co.*, 676 F.2d 56 (3d Cir. 1982); and (3) *Chemstar*, 41 F.3d 429 (9th Cir. 1994).  These cases, however, are inapposite.

First and foremost, none of them references a "chain of business decisions" or holds that a series of business decisions constitutes a single occurrence under an insurance policy when applying the cause test.  Second, both *CHS* and *Appalachian* address whether a particular insurance policy is a "per occurrence" or "per claim" policy—a different issue than the *number* of occurrences under an insurance policy.  *See CHS*, 2013 WL 650047, at *5–8; *Appalachian*, 676 F.2d at 59.  Also, in *Appalachian*, the Third Circuit Court of Appeals affirmed the district court's holding that an insurance company's adoption of discriminatory employment policies was a single occurrence under the relevant insurance policy.  *Appalachian*, 676 F.2d at 60.  It is difficult to fathom Big Lots' argument that the company's *one-time* decision to adopt discriminatory employment policies can constitute a "chain" of decisions.  Notably, the Court explicitly stated that it could "not even speculate" how the principles applied in *Appalachian*—a case involving employment discrimination—"would apply, if at all" to product liability cases.  *Id.* at 62 n.14.  Finally, similar to the *Appalachian* court, the *Chemstar* court found a lime plaster

company's continuing failure to warn consumers of the plaster's unsuitability for interior use to be a single proximate cause, and also noted that there was no intervening proximate cause after the failure to warn.  *Chemstar*, 41 F.3d at 432.  The failure to warn was a single act—not a "chain of business decisions."  Additionally, unlike in the case *sub judice*, there was no intervening cause in *Chemstar*.

It is also noteworthy that the Torch Case plaintiffs do not use the phrase "chain of business decisions" in their complaints.  Rather, this appears to be a term divined by Big Lots to fit its single occurrence theory.  This Court finds that to hold that a "chain of business decisions" is a single proximate cause giving rise to a single occurrence under an insurance policy would create a standard so general that it would present no standard at all, such that, as American Guarantee argues, "almost any loss can be viewed as resulting from a' chain of business decisions.'"  (Doc. 80 at 13.)

For all of these reasons, the Court finds that there have been multiple occurrences under the American Guarantee Policy and **GRANTS** American Guarantee's Motion for Summary Judgment on this issue.

### C.  The Maintenance SIR Is Not Implicated Here.[7]

As set forth above, the American Guarantee Policy has a Maintenance SIR provision, which reads as follows:

> Maintenance Self Insured Retention Applicable to Coverage A – After Underlying Aggregate Limits Are Reduced or Exhausted
> …
>
> 1.  If the limits of the **underlying insurance** have been reduced solely by payment of **loss** for which coverage is afforded under this policy, this policy will drop down to become immediately excess of the reduced underlying limits or

---

[7] As Big Lots correctly notes, the issue of whether the Maintenance SIR has been triggered can be resolved independent of the "occurrence" issue.  (*See* Doc. 70 at 26.)

2.  If the limits of the **underlying insurance** have been exhausted solely by payment of loss for which coverage is afforded under this policy, this policy will continue in force as **underlying insurance**.

3.  If the aggregate limits of **underlying insurance** have been reduced or exhausted solely by the payment of loss for which coverage is afforded under this policy, our obligations under F.1 and 2. above to drop down or continue in force as underlying insurance shall be subject to the **Retained Amount** listed in this endorsement.

**Retained Amount** means the amount of damages applicable to each **occurrence** for which the insured is responsible that is shown in the Scheduled of Retained Amount in this endorsement.  **Retained Amount** includes defense costs.

(Doc. 61 ¶ 16, Ex. 3, Endorsement No. 14 (emphasis in original).)  The Maintenance SIR Endorsement lists the retained amount as $1,000,000 per occurrence and $2,000,000 in the aggregate.  (*Id.* Ex. 3, Endorsement No. 14.)  The Endorsement added only subparagraph 3; subparagraphs 1 and 2 were in the original American Guarantee Policy.  (*See* Doc. 70 at 24; Doc. 76 at 22.)  The parties disagree about whether subparagraph 3 of the Maintenance SIR has been triggered here.

Helpful to the determination of this issue is a brief background of the difference between "excess" and "drop down" coverage.  As stated above, the primary Arch Policy has a "per occurrence" limit of $1,000,000 and an aggregate limit of $4,000,000.  (*See* Doc. 61, Ex. 2.)  In the event that Arch's "per occurrence" limit is exhausted, American Guarantee is required to provide excess coverage, in the event of an additional occurrence.  (*See* Doc. 70 at 20.)  But if Arch reaches its aggregate limit, then American Guarantee is required to "drop down" and provide primary coverage for subsequent claims.  (*Id.*)  Because secondary carriers do not want to provide first-dollar coverage, when they are asked to "drop down" and serve as primary layer insurers, they employ Maintenance SIRs, which require a certain level of self-insurance in the event of aggregate exhaustion.  (*See id.* at 20–21.)

18

Big Lots argues that, under the plain language of the American Guarantee Policy, when Arch's $4,000,000 aggregate limit is exhausted, American Guarantee provides "drop down" coverage and replaces Arch as the underlying insurance.  (*See id.*, Ex. 3 at 10 (Section II-F).) Because Arch's aggregate limit has not been exhausted, according to Big Lots, the Maintenance SIR has not been implicated.  (*See* Doc. 61 ¶ 17; Doc. 70 at 23–24.)

In response, American Guarantee argues that it is Big Lots that ignores the plain language of the Maintenance SIR, which clearly states that it applies after the underlying aggregate limits are *reduced or* exhausted.  (Doc. 61 ¶ 16, Ex. 3, Endorsement No. 14 (emphasis added).) According to American Guarantee, Big Lots ignores the words "reduced" and "or" and would like the Court to do the same—which it cannot do.  *See, e.g.*, *Sherwin-Williams Co. v. Travelers Cas. & Sur. Co.*, No. 82867, 2003 WL 22671621, at *4 (Ohio Ct. App. Nov. 13, 2003) ("Insurance contracts should be interpreted in a way that renders all the provisions meaningful and not mere surplusage.").  Based on the language of the Maintenance SIR, American Guarantee argues that *any* payment made under the Arch Policy "will necessarily either reduce or exhaust the Arch Policy's aggregate limits," and thus the Maintenance SIR is not implicated solely when the Arch Policy's aggregate limits are exhausted.  (Doc. 76 at 23.)  In further support of its argument, American Guarantee notes (and Big Lots acknowledges) that the Maintenance SIR is a manuscript endorsement, or a custom endorsement negotiated between the parties—meaning that the SIR's terms are not automatically construed against the insurer.  (*See* Doc. 76 at 23.)  Additionally, American Guarantee deems Big Lots' discussion of "dropping down" versus providing excess coverage irrelevant, as it allegedly addresses the issue in a "vacuum"—overlooking the fact that the Maintenance SIR Endorsement provides a different

meaning for dropping down: "providing excess coverage at a lower point than usual, not taking the place of underlying coverage."  (*Id.* at 24.)

But according to Big Lots, the term "drop down" in the Maintenance SIR has the meaning that is typical in the industry, and that the Maintenance SIR applies only in a narrow situation.  Big Lots explains Section II(F)(1) of the Maintenance SIR as follows:

> [I]n most cases (including the instant case) [American Guarantee] will not be asked to provide coverage until [Arch] answers for $1 million in liability coverage [(its occurrence limit).]  In some cases, however, the $4 million aggregate limit of the primary-layer policy may have been eroded (or reduced) by other claims, such that the primary layer coverage available for a claim is less than $1 million. For instance, if Big Lots' primary insurer had already paid $3.5 million across other unrelated covered claims, Big Lots would only have $500,000 in primary layer insurance available. [American Guarantee] would still be obligated to provide coverage in excess of the $1 million underlying limit.  However, Big Lots would be left with a $500,000 coverage gap. To address this situation, Section II(F)(1) of the [American Guarantee] Policy provides:
>
> > If the limits of underlying insurance have been reduced solely by payment of loss for which coverage is afforded under this policy, this policy will drop down to become immediately excess of the reduced underlying limits.
>
> [ECF Doc. # 70-3 at Pg ID 1335.] In other words, Section II(F)(1) requires [American Guarantee] to fill the coverage gap. This provision requires [American Guarantee] to "drop down" below its normal $1 million attachment point and provide "coverage immediately excess of the reduced underlying limits [the reduced underlying limits being $500,000 in the foregoing example]."

(Doc. 81 at 14.)

Thus, Big Lots contends that Section II(F)(1) of the Maintenance SIR addresses American Guarantee's "drop down" obligations when the Arch Policy's limits have been *reduced*, but not exhausted.  Section II(F)(2) sets forth American Guarantee's obligation to "continue in force" as the underlying insurer when the Arch Policy's limits are completely *exhausted*.  And Section II(F)(3), added by the Maintenance SIR Endorsement, protects American Guarantee in the event that it has to drop down or continue in force as the primary

20

insurer if the Arch Policy's *aggregate* limits are reduced or exhausted by subjecting Big Lots to the Retained Amount.  (*See* Doc. 81 at 15.)

Based on the plain language of the Maintenance SIR, American Guarantee's obligations to drop down or continue in force as underlying insurance are only subject to the Retained Amount when the Arch Policy's *aggregate* limits have been reduced or exhausted.  It is undisputed that this has not occurred.  Rather, Arch has paid its $1,000,000 "per occurrence" limit and American Guarantee is simply providing excess coverage; it is not "dropping down" or "continuing in force" as the underlying insurer.  (*See id.* at 18.)  And this Court agrees with Big Lots that the "Maintenance SIR is never implicated where [American Guarantee] is simply providing excess (as opposed to drop-down or primary layer) coverage."  (*Id.* at 19.)

Big Lots' interpretation makes sense because it does not render any words or subsections in the Maintenance SIR superfluous.  *Sherwin-Williams Co.*, 2003 WL 22671621, at *4. Because insurance policies must be construed to give every word meaning, it follows that, by adding the word "aggregate" in front of the word "limits" in subparagraph 3 of the Maintenance SIR, the parties intended that the Retained Amount be paid only when Arch's aggregate limits were reduced or exhausted, not every time that Arch reached its "per occurrence" limit.  *See Fed. Ins. Co. v. Cintas Corp.*, No. 1:04-cv-00697, 2006 WL 1476206, at *7 (S.D. Ohio May 25, 2006) (noting "principles of construction direct courts to give meaning to all policy provisions and avoid interpretations that render any part of the contract superfluous.").  Moreover, from a practical standpoint, providing American Guarantee with an additional layer of protection in this narrow circumstance seems much more reasonable than Big Lots agreeing to pay American Guarantee $1,000,000 *every time* that American Guarantee is called upon to provide excess coverage.  (*See* Doc. 81 at 16.)

21

For all of these reasons, the Court **GRANTS** Big Lots summary judgment on its claim for a declaratory judgment that the Maintenance SIR has not been triggered here.  American Guarantee's motion for summary judgment on this point is **DENIED**.

### D.  American Guarantee Did Not Engage in Bad Faith Conduct.

Although Big Lots alludes that the parties have agreed to resolve Big Lots' bad faith claim by agreement (*see* Doc. 70 at 1), both parties have provided some briefing on the issue and thus the Court will address it.

An insurer fails to exercise good faith when it refuses to pay a claim without "reasonable justification." *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 691 F.3d 821, 834 (6th Cir. 2012) (quoting *Zoppo v. Homestead Ins. Co.,* 644 N.E.2d 397, 399–400 (Ohio 1994)).  Denial of a claim may be reasonably justified when "the claim was fairly debatable and the refusal was premised on either the status of the law at the time of the denial or the facts that gave rise to the claim." *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 605 N.E.2d 936, 943 (Ohio 1992).

Aside from reiterating its disagreement on the merits with American Guarantee's interpretation of the term "occurrence" and the language of the Maintenance SIR, Big Lots does not articulate any reason that American Guarantee's position is not "fairly debatable."  (*See* Doc. 75 at 15–17.)  Given that there is an abundance of case law dedicated to sorting out these issues—particularly the single vs. multiple occurrences issue—Big Lots would be hard-pressed to convince the Court that American Guarantee's positions lack *any* legal basis.  In fact, the Court *agrees* with American Guarantee's interpretation of its excess insurance policy on the

number of occurrences issue.[8]  For these reasons, the Court **GRANTS** summary judgment in favor of American Guarantee on Big Lots' bad faith claim.

### III.  CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** American Guarantee's Motion and **GRANTS in part** and **DENIES in part** Big Lots' Motion.  This case is hereby **DISMISSED.**

**IT IS SO ORDERED**.


         **s/ Algenon L. Marbley**
         **ALGENON L. MARBLEY**
         **UNITED STATES DISTRICT JUDGE**

**Dated: March 2, 2017**

---

[8] Although the Court disagrees with American Guarantee's interpretation of the Maintenance SIR, contrary to Big Lots' assertion, it is not so "tortured and inappropriate" as to rise to the level of bad faith.  (*See* Doc. 75 at 16.)

23